**F I L E D**

PUBLISH

**February 16, 2006**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

Nos. 04-3084, 04-3118

CLINTON ODELL WEIDNER, II, and
DAVID C. WITTIG,

Defendants-Appellants.

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 02-CR-40140-01/02-JAR)**

Bruce W. Simon, Kansas City, Missouri, for Defendant-Appellant Clinton Odell Weidner, II.

Steven A. Reiss, Weil, Gotshal & Manges LLP, New York, New York (Jeffrey D. Morris, Berkowitz, Stanton, Brandt, Williams & Shaw, Prairie Village, Kansas, and Gregory S. Coleman, Lisa R. Eskow, and Meredith B. Parenti, Weil, Gotshal & Manges LLP, Austin, Texas, with him on the briefs), for Defendant-Appellant David C. Wittig.

Richard L. Hathaway, Senior Litigation Counsel, Topeka, Kansas (Eric F. Melgren, United States Attorney, with him on the brief), for the Plaintiff-Appellee.

Before **HENRY** , **LUCERO** , Circuit Judges, and    **BRACK** , District Judge. *

**HENRY,** Circuit Judge.

This federal criminal prosecution arises out of a $1.5 million loan from David C. Wittig to Clinton Odell Weidner, II.  In April 2001, when Mr. Wittig made the loan, Mr. Weidner was the president, chief executive officer, and general counsel of the Topeka, Kansas bank at which Mr. Wittig did business. The government alleged that Mr. Weidner and Mr. Wittig concealed the loan, and the jury agreed, convicting both men of one count of conspiracy to submit false entries to a federally insured bank and to launder money, in violation of 18 U.S.C. § 371; four counts of making a false bank entry, in violation of 18 U.S.C. § 1005; and one count of money laundering, in violation of 18 U.S.C. § 1957.  The jury also convicted Mr. Weidner of a criminal forfeiture count involving the Arizona real estate in which he had invested the $1.5 million that he had borrowed from Mr. Wittig.  The district court sentenced Mr. Wittig to concurrent terms of fifty-one months' imprisonment on each of the six counts, followed by a three-year

---

* The Honorable Robert C. Brack, United States District Judge for the District of New Mexico, sitting by designation.

term of supervised release, and ordered him to pay a $1 million fine. The court sentenced Mr. Weidner to concurrent terms of seventy-eight months' imprisonment, also followed by three years' supervised release.

In this appeal, Mr. Weidner and Mr. Wittig raise a variety of issues relating to the sufficiency of the evidence and the adequacy of the jury instructions. They also challenge their sentences, arguing that the district court erred in calculating the amount of loss and in basing their sentences on factual findings not made by the jury.

Although the government's case was largely circumstantial, we conclude that the evidence was sufficient and that the jury instructions were adequate. However, as to the defendants' sentencing challenges, we conclude that, in light of the ambiguity of the Guidelines, the district court did err in calculating the amount of the loss. Accordingly we affirm the defendants' convictions, vacate their sentences, and remand the cases for resentencing in accordance with this opinion and the principles set forth in United States v. Booker, 543 U.S. 220 (2005).

## I. BACKGROUND

In recounting the relevant facts, we view the record in the light most favorable to the government. See United States v. Radcliff, 331 F.3d 1153, 1157 (10th Cir. 2003).

## A.  The Loan Transactions

During 2001 and 2002, Mr. Weidner was the president, chief executive officer, and general counsel of Capital City Bank in Topeka, Kansas.  Mr. Wittig was an established Capital City Bank customer with substantial assets: a March 2001 financial statement on file with the bank reported a net worth of $33.921 million.  He was the chairman of the board, president, and chief executive officer of Western Resources, Inc., the largest electric utility in Kansas.

In 1998, Mr. Wittig borrowed $700,000 to purchase the Landon Mansion in Topeka, Kansas.  Two years later, he opened a $1 million line of credit in order to renovate the mansion.  By April 2001, Capital City Bank had increased Mr. Wittig's line of credit to $3.5 million.

In early 2001, Michael Earl, another Capital City Bank customer, approached Mr. Weidner about a real estate project in Scottsdale, Arizona that required a $1.5 million investment.  Mr. Earl told Mr. Weidner that he was not capable of making this investment, but he asked Mr. Weidner if he knew of anyone who would be interested.

-4-

Mr. Weidner informed Mr. Wittig of the Arizona project and asked if he was interested. Mr. Wittig responded that he thought that the investment was a great opportunity but had other projects that he wanted to pursue instead. In particular, Mr. Wittig explained that he thought he could get a better return at less risk by investing in a new utility company called Westar.

Mr. Weidner then told Mr. Earl of his own interest in the Arizona project, and he reached an agreement with Mr. Earl requiring a $1.5 million investment in exchange for an interest in the real estate. Mr. Weidner did not have the $1.5 million he needed to make the investment. Moreover, as to its employees, Capital City Bank rules limited loans not involving a principal residence or children's educational expenses to $100,000. Accordingly, Mr. Weidner needed to look elsewhere for funds, and he approached Mr. Wittig about a loan.

In late April 2001, Mr. Weidner directed his administrative assistant, Christy Gurney, to prepare a loan proposal increasing Mr. Wittig's line of credit from $3.5 million to $5.0 million. The proposal characterized its purpose as a "[s]hort term increase of [Mr. Wittig's] operating line for investments & renovation costs," Wittig App. at 523, adding that "David is the President and CEO of Western Resources, Inc. He utilizes the Line of credit to purchase stock and make business investments. He is also using the line to complete the final renovation costs of the Landon mansion as well as their personal funds." Id. at

524. At trial, Ms. Gurney testified that Mr. Weidner provided her with the information that she included in the loan proposal. The owner of Capital City Bank, Frank Sabatini, approved the proposal on April 27, 2001. According to Ms. Gurney, Mr. Wittig did not review the written loan proposal before it was approved.

On April 30, 2001, however, Mr. Wittig and his wife did sign a "Change In Terms Agreement" related to the $1.5 million increase in the line of credit. A printed section of that document stated that the existing indebtedness was "the promissory note from borrower to lender dated 7/30/00" and that "this change in terms will serve to increase the line from the current availability of $3,500,000 to a line availability of $5,000,000." Id. at 528-29, 532. Mr. Wittig crossed out the $5 million figure and wrote "$6,000,000" instead. The change of terms agreement provided for interest at an initial annual rate of 5.39% and contained provisions regarding default, set off, and collateral. However, the agreement contained no further description of the purpose of the increase in the line of credit. The agreement also included a printed section stating that "[t]his written agreement is the final expression of the agreement between Lender and Borrower and may not be contradicted by evidence of any prior oral agreement or contemporaneous oral agreement between Lender and Borrower." Id. at 528. Finally, a section concerning "nonstandard terms" was left blank.

Mr. Wittig faxed the signed agreement to Ms. Gurney at Capital City Bank. On the same day, April 30, 2001, two transactions posted to Mr. Wittig's account at Capital City Bank: a $1.5 million deposit and a $1.5 million withdrawal. The $1.5 million was routed to Security Title in Phoenix, Arizona, the company handling the real estate transaction in which Mr. Weidner wanted to invest. Ms. Gurney testified at trial that she had not personally ordered the wire transfers and did not know who had done so. However, she added that Mr. Weidner had the authority and ability to make the wire transfers himself.

On the following day, Mr. Weidner and Mr. Wittig executed a promissory note that required Mr. Weidner to pay Mr. Wittig $1.5 million at 7 % interest–in one payment of the $1.5 million principal plus interest (due in a year), as well as quarterly interest payments beginning on August 1, 2001. The note was secured by the accounts, contract rights, and general intangibles of the Arizona real estate project. At trial, an FDIC official testified that this promissory note was not discovered in the regular examinations of the bank's records. In the following weeks, Mr. Wittig received two additional $500,000 increases in his line of credit at Capital City Bank–one on May 14, 2001, and another on June 7, 2001.

Mr. Weidner and Mr. Wittig both filed documents with the bank that failed to disclose the $1.5 million loan between them. First, on May 14, 2001, Mr. Weidner submitted his responses to an officer's questionnaire, part of a regular

examination of the bank by the FDIC. One question asked Mr. Weidner to "[l]ist all extensions of credit made for the accommodation or direct benefit of anyone other than those whose names appear either on the note or on other related credit instruments." Wittig App. at 685. Mr. Weidner responded "none." Id. Second, on May 31, 2001, Mr. Weidner submitted an annual personal financial statement on a preprinted form containing a section listing notes, accounts, and bills and contracts payable. Mr. Weidner left that section blank. Finally, on January 8, 2002, Mr. Wittig and his wife submitted an annual financial statement required by the terms of their credit agreement with the bank. The Wittigs stated that they had $5.5 million in liabilities to Capital City Bank but did not list a $1.5 million loan to Mr. Weidner as an asset.

In late July 2001, soon before the first payment on the $1.5 million note from Mr. Wittig came due, Mr. Weidner requested a loan of $20,000 from the Capital City Bank. In the loan application, he stated that the purpose of the loan was to finance the purchase of a Harley Davidson motorcycle. Mr. Weidner obtained the loan and deposited the $20,000, along with a personal check for $7,000, into an account at a different bank, Capitol Federal Savings and Loan. At Capitol Federal, Mr. Weidner drew a cashier's check payable to Mr. Wittig. Mr. Wittig deposited this check into a money market account at a third bank.

-8-

Mr. Weidner made additional payments to Mr. Wittig: one on January 31, 2002, for $52,500, and another one on May 6, 2002, for $17,500. He used his account at Capitol Federal to make those payments, and, in conjunction with that Capitol Federal account, he submitted a financial statement that again omitted his liability to Mr. Wittig on the $1.5 million note.

At Capital City Bank, Mr. Weidner first disclosed the loan from Mr. Wittig in a conversation with his administrative assistant Ms. Gurney in June 2001. He told her that he was the beneficiary of the $1.5 million increase in Mr. Wittig's line of credit in April 2001. He added that he had invested the money in a luxury subdivision and that he hoped to make a $1 million profit.

In October 2001, Ms. Gurney relayed that information to Bob Kobberman, who was then Capital City's chief loan officer. Bank officials filed a suspicious activity report with the FDIC and also conveyed the information about the Wittig-Weidner loan to the bank's bonding company. After the disclosure of the loan, Mr. Weidner asked a friend, J.B. McGivern, to pay back the loan from Mr. Wittig. Mr. McGivern obtained the money and transferred it to Mr. Weidner's Arizona partner, Michael Earl. Mr. Earl then transferred the funds to Mr. Wittig's account at Capital City Bank, and Mr. Wittig paid down his line of credit by $1.6 million.

In April 2002, Mr. Weidner resigned from his position with Capital City Bank. Bank officials   asked Mr. Wittig to pledge additional utility stock, to

increase the mortgage on his personal residence, and to provide $1 million in life insurance benefits to properly collateralize the loan. Mr. Wittig complied with those requests. In July 2002, he paid off his line of credit with Capital City and opened accounts with another bank.

### B. The Government's Allegations

The government charged Mr. Weidner and Mr. Wittig with the following offenses: conspiracy to submit false entries to a federally insured bank and to launder money, in violation of 18 U.S.C. § 371 (count 1); making or aiding and abetting in the making of false bank entries, in violation of 18 U.S.C. § 1005 and 18 U.S.C. § 2 (counts 2-5); and money laundering, in violation of 18 U.S.C. § 1957 (count 6). The government also sought criminal forfeiture of the Arizona real estate (count 7).

The false bank entries alleged in counts 2 through 5 concerned the documents that failed to reveal a $1.5 million loan from Mr. Wittig to Mr. Weidner: (a) the April 27, 2001 loan proposal stating that Mr. Wittig was requesting a $1.5 million increase in his line of credit to renovate the Landon Mansion and to make business investments (count 2); (b) Mr. Weidner's May 14, 2001 response to the FDIC's questionnaire (count 3); (c) Mr. Weidner's annual

financial statement, submitted to Capital City Bank on May 31, 2001 (count 4); and (d) the Wittigs' January 8, 2002 financial statement, submitted to Capital City Bank under the terms of their credit agreement (count 5).

### C. Mr. Wittig's Defense

At trial, Mr. Wittig did not contest making the loan to Mr. Weidner. However, he argued that he reasonably assumed that the Capital City Bank officials knew about the loan and that he in no way authorized Mr. Weidner's false statements.

In support of his defense, Mr. Wittig noted that he was not involved in the preparation of the April 27, 2001 loan proposal requesting the $1.5 million increase in his line of credit, and he contended that he did not even see the document before the increase was approved. Similarly, Mr. Wittig pointed to Mr. Weidner's testimony that Mr. Wittig was not involved in any way in the submission of the May 14, 2001 questionnaire responses and the May 31, 2001 financial statement. Additionally, Mr. Wittig invoked the testimony of Michael Earl, the man who had informed Mr. Weidner about the Arizona real estate opportunity. Mr. Earl stated that he believed that Capital City Bank officials knew about Mr. Weidner's Arizona real estate investment because Mr. Weidner was the head of the bank and, if Mr. Weidner knew about the investment, Mr.

Earl assumed the bank knew too. According to Mr. Wittig, he made the same assumption about the $1.5 million loan to Mr. Weidner—that Mr. Weidner would inform the bank.

As to his own financial statement, which also did not disclose a $1.5 million loan to Mr. Weidner, Mr. Wittig argued to the jury that the document was submitted after Mr. Weidner had confided in Ms. Gurney about the loan and after Ms. Gurney had informed Mr. Kobberman, the bank's chief loan officer, about the transaction. Thus, he contended that the omission of the loan from the financial statement was not intended to injure or defraud the bank. Moreover, Mr. Wittig observed, like other financial statements he had submitted to the bank, this one omitted other assets and liabilities, such as a $1 million mortgage from Capital City Bank on his home. According to Mr. Wittig, all of the omitted items were linked to transactions with Capital City Bank or other information that the bank, through Mr. Weidner, already knew. Mr. Wittig further contended that the omission was not material: the financial statement listed $38 million in assets, which far exceeded Mr. Wittig's outstanding debt to Capital City Bank.

Mr. Wittig also challenged the government's contention that his depositing loan payments from Mr. Weidner into a money market account outside of Capital City Bank demonstrated his intent to conceal the loan. He noted that he did not have a money market account at Capital City Bank and that the government's own

witnesses acknowledged that money market accounts typically pay higher interest rates than checking accounts. Moreover, he added, he had used the money market account for years, and he submitted records of deposits into the account for more than a year before the deposits of Mr. Weidner's interest payments on the $1.5 million loan.

Finally, Mr. Wittig attacked the government's "quid pro quo" theory—that Mr. Wittig had made the loan to Mr. Weidner in order to obtain financing for a new utility company. He argued that there was no need for the alleged quid pro quo because the board of directors of Capital City Bank had openly discussed lending money to the utility company executives, including Mr. Wittig, and because this transaction was widely regarded as an outstanding business opportunity for the bank. Additionally, under the bank's lending rules, the proposed financing of the utility exceeded the amount that Mr. Weidner could personally approve.

### D. Mr. Weidner's Defense

Mr. Weidner pleaded guilty to counts 3 and 4 (making false entries on the May 14, 2001 questionnaire responses and the May 31, 2001 financial statement), but he defended the remaining counts at trial. His defense as to the conspiracy count, the allegedly false statements on the April 27, 2001 loan proposal, and the

money laundering charge (counts 1, 2, and 6) was that he had not intended for the $1.5 million increase in Mr. Wittig's line of credit to be used for the Arizona venture. He testified that, although he did intend to borrow money from Mr. Wittig, his understanding was that the money would come from a source outside Capital City Bank. As to Mr. Wittig's January 8, 2002 financial statement (the subject of count 5), Mr. Weidner maintained that the statement was submitted by Mr. Wittig acting alone.

E.  The Judge's Findings at Sentencing

After the jury convicted Mr. Wittig and Mr. Weidner, the district court applied the 2001 version of the United States Sentencing Guidelines (USSG) (those in effect at the time of the offense conduct). The sentencing proceedings focused on the determination of the offense level based on the amount of loss.

The court determined the amount of loss in two ways. Applying USSG § 2B1.1(b)(12) , the court considered the gross receipts that the defendants had obtained from the offenses of conviction. The court also determined the amount of intended loss. The court found that both Mr. Wittig and Mr. Weidner had received $1.5 million in gross receipts and that they had each intended a loss of that amount. As to Mr. Weidner, the court further found that he had obstructed justice and that he had abused a position of trust. Applying USSG §§ 3C1.1 and

3B1.3, the court increased Mr. Weidner's offense level by two points for each of those findings.

As to Mr. Wittig, the court imposed concurrent sentences of fifty-one months' incarceration, a fine of $1 million, and a three-year term of supervised release. The court sentenced Mr. Weidner to concurrent terms of seventy-eight months' incarceration and three years' supervised release.

## II. DISCUSSION

In these appeals, Mr. Wittig and Mr. Weidner both challenge the sufficiency of the evidence supporting their (a) 18 U.S.C. § 371 conspiracy convictions; (b) 18 U.S.C. § 1005 bank fraud convictions; and (c) 18 U.S.C. § 1957 convictions for money laundering. Mr. Wittig further argues that (d) the district court erred in admitting evidence concerning his wealth and his executive employment agreement with the utility company; and (e) the court erred in instructing the jury on the § 1005 count and in refusing to give an instruction that nominee loans are not illegal per se.

Both defendants also challenge their sentences on several grounds. Mr. Wittig argues that (f) the district court erred in calculating the amount of loss under USSG § 2B1.1(b)(12) based on loan proceeds he received because the court had already determined that Mr. Weidner had benefitted from those proceeds.

Both defendants argue that (g) the district court erred in increasing the offense level based on intended loss under USSG § 2B1.1(b)(1)(I) when the loan obtained by Mr. Wittig was fully collateralized and fully repaid; and (h) the district court violated their Sixth Amendment rights by relying on facts not found by the jury in imposing the sentence.

For the reasons set forth below, we must reject the defendants' various challenges to their convictions. However, as to their sentences, we conclude that the district court erred in calculating the amount of loss and we therefore remand for resentencing under the principles set forth in United States v. Booker, 543 U.S. 220 (2005).

A.  Sufficiency of Evidence Supporting § 371 Conspiracy Convictions

At the close of the government's case, the district court denied Mr. Wittig's and Mr. Weidner's motions for judgments of acquittal on the conspiracy charge and the substantive offenses. Both defendants now challenge that decision.

We engage in de novo review. United States v. Bush, 405 F.3d 909, 919 (10th Cir. 2005). In doing so, we consider both direct and circumstantial evidence, and all reasonable inferences therefrom, in the light most favorable to

the government. Id. We do not "question the jury's credibility determinations or its conclusions about the weight of the evidence." United States v. Lazano-Villalobos, 175 F.3d 838, 843 (10th Cir. 1999). There is sufficient evidence to support a conviction if "a reasonable jury could find the defendant guilty beyond a reasonable doubt." Bush, 405 F.3d at 919 (quotation and citation omitted). Nevertheless, "[t]he evidence, when viewed in its entirety, must generate more than a mere suspicion of guilt, and where such evidence is equally consistent with both guilt and innocence the conviction cannot be sustained." United States v. Fox, 902 F.2d 1508, 1513-14 (10th Cir. 1990) (quoting Direct Sales Co. v. United States, 319 U.S. 703, 711 (1943)). Additionally, "we may not uphold a conviction obtained by piling inference upon inference." United States v. Valadez-Gallegos, 162 F.3d 1256, 1262 (10th Cir. 1998).

We begin with the 18 U.S.C. § 371 conspiracy charge. In order to convict a defendant of that offense, the government must prove beyond a reasonable doubt that (1) the defendant entered into an agreement; (2) the agreement involved a violation of the law; (3) one of the members of the conspiracy committed an overt act; (4) the overt act was in furtherance of the conspiracy's object; and (5) the defendant wilfully entered the conspiracy. United States v. Dazey, 403 F.3d 1147, 1159 (10th Cir. 2005).

"The core of a conspiracy is an agreement to commit an unlawful act." United States v. Morehead, 959 F.2d 1489, 1500 (10th Cir. 1992) (quoting United States v. Esparsen, 930 F.2d 1461, 1471 (10th Cir. 1991)). "[T]he critical inquiry is whether the circumstances, acts, and conduct of the parties are of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exists." Id. (quoting United States v. Kendall, 766 F.2d 1426, 1431 (10th Cir. 1985)). The existence of the agreement to violate the law may be inferred from a "unity of purpose or common design and understanding" among conspirators to accomplish the objects of the conspiracy. Kendall, 766 F.2d at 1431.

Secrecy and concealment are often necessary to a successful conspiracy, and, as a result, direct evidence of the crime is frequently difficult to obtain. Dazey, 403 F.3d at 1159. "Therefore, conspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of action." Id.

Moreover, a conspiracy conviction requires "at least the degree of criminal intent necessary for the substantive offense itself." Morehead, 959 F.2d at 1500 (internal quotation marks omitted). Thus, mere knowledge or acquiescence in the purposes of the conspiracy is not sufficient to establish the defendant's willful

-18-

entry into the conspiracy.  United States v. Migliaccio, 34 F.3d 1517, 1521 (10th Cir. 1994).  Instead, the government must establish "informed and interested cooperation, stimulation, [or] instigation."  Direct Sales, 319 U.S. at 713.

Here, the government alleged that Mr. Weidner and Mr. Wittig engaged in a conspiracy to make false bank entries in violation of 18 U.S.C. § 1005 and to launder money in violation of 18 U.S.C. § 1957.  A § 1005 conviction requires the government to prove that the defendant knowingly made a false bank entry or caused such a false entry to be made and that the defendant intended to defraud one or more of the bank's officers, auditors, examiners, or agents.  United States v. Evans, 42 F.3d 586, 592 (10th Cir. 1994).  Section 1957 requires the government to prove the defendant's knowing engagement in a transaction involving criminally derived property; the defendant must know that the property in question is "criminally derived."  United States v. Allen, 129 F.3d 1159, 1164 (10th Cir. 1997) (quoting United States v. Pettigrew, 77 F.3d 1500, 1513 (5th Cir. 1996)).  As a result, in order to establish the § 371 conspiracy charge against Mr. Weidner and Mr. Wittig, the government was required to prove that the two men agreed to make false bank entries to defraud bank officials, and to knowingly engage in a transaction involving criminally derived property.

With those principles in mind,    we address each defendant's contentions in turn.

1.  Mr. Wittig

In challenging his § 371 conspiracy conviction, Mr. Wittig repeats the arguments that he advanced at trial—that Mr. Weidner acted independently in completing the April 27, 2001 loan proposal, May 14, 2001 questionnaire responses, and May 31, 2001 personal financial statement, and that, as to Mr. Wittig's own January 8, 2002 financial statement, the government failed to establish that the omission of the $1.5 million loan to Mr. Weidner demonstrated an intent to deceive the bank.  As a customer of Capital City Bank, Mr. Wittig maintains, he reasonably assumed that Mr. Weidner would fulfill his obligations to disclose the loan to the bank, and Mr. Weidner's failure to do so is insufficient to prove the § 371 conspiracy charge.

We acknowledge that the sufficiency of the evidence against Mr. Wittig presents a close issue.  The government's theory was that the $1.5 million increase in Mr. Wittig's line of credit in April 2001 was a nominee loan, a sham transaction in that Mr. Wittig was not the actual borrower and that the purpose of the increase was not to renovate the Landon Mansion and fund Mr. Wittig's other investments, as the April 27, 2001 loan proposal stated, but rather to provide Mr. Weidner with funds to invest in Arizona real estate.  See United States v. Waldroop, 431 F.3d 736, 741 (10th Cir. 2005) (discussing nominee loans).

"Nominee loans are not inherently illegal, but are illegal if they are used to deceive a financial institution about the true identity of a borrower." Id.; see also United States v. Saks, 964 F.2d 1514, 1519 (5th Cir. 1992) (stating that "[c]ourts have on several occasions concluded that if a borrower obtains funds at the insistence of and for the benefit of a bank officer, without disclosing the officer's interest on the loan documents, thereby knowingly flouting banking rules and regulations designed to protect the financial integrity of the bank, a jury can conclude that both borrower and officer acted with intent to defraud the bank"); United States v. Shively, 715 F.2d 260, 266 (7th Cir. 1983) (observing that "[t]here is no law against a bank customer's lending to a bank officer, but [the defendant bank customer] refused to lend [the defendant bank official] his own money; and the bank would not wittingly have helped [the customer] get a hold over [the bank official] by providing [the customer] with money to lend to [the bank official]").

In contrast to many of the reported cases involving nominee loans, the government here presented no direct evidence that the alleged nominal borrower, Mr. Wittig, suggested to the actual borrower, Mr. Weidner, that a nominee loan scheme could be used to deceive the bank and obtain the loan. See Waldroop, 431 F.3d at 738, 742 (discussing evidence that the defendant "came up with the plan to use nominee loans as a way around [the bank's borrowing] limit" and that

-21-

the defendant had stated that "he personally could not get a loan" and had therefore suggested that the co-defendant sign the loan application); <u>United States. v. Kennedy</u>, 564 F.2d 1329, 1341 (9th Cir. 1977) (discussing direct evidence that the defendant told a co-defendant to include false information on a loan application).

Nevertheless, the government did present substantial circumstantial evidence of Mr. Wittig's participation in the alleged conspiracy. First, in order to obtain the $1.5 million increase in his line of credit in April 2001, Mr. Wittig signed a change in terms agreement that closely resembled other change in terms agreements that he signed in order to increase his line of credit (<u>e.g.</u>, the agreements he signed in May and June 2001). The April 2001 change in terms agreement described an increase in Mr. Wittig's line of credit, not a loan to Mr. Weidner, and it recited that there were no non-standard terms. Yet the government's evidence supported the inference that Mr. Wittig intended the $1.5 million to be used by Mr. Weidner for an investment in which Mr. Wittig himself had declined to participate.

Another aspect of that change in terms agreement supports the government's contention that Mr. Wittig was involved in concealing the loan to Mr. Weidner. Although the April 27, 2001 loan proposal prepared by Ms. Gurney requested an increase in the line of credit from $3.5 million to $5 million, Mr.

Wittig sought to modify the request by deleting the $5 million figure on the change in terms agreement and writing in $6 million. The fact that Mr. Wittig sought and obtained two additional $500,000 line of credit increases shortly thereafter permits the inference that, in making the request for $6 million on April 27, Mr. Wittig sought to obtain $1.5 million for Mr. Weidner and $1 million for himself through one single line of credit increase and that he sought to do so without disclosing that part of the requested increase was for Mr. Weidner.

Moreover, the loan transaction between Mr. Wittig and Mr. Weidner was structured in such a way that Mr. Weidner himself received no direct payments from Mr. Wittig. Instead, the $1.5 million was deposited in Mr. Wittig's account and then transferred on the same day to the Arizona title company managing the Arizona real estate transaction. As the district court noted, this was the first of several instances in which "[the] transfer of funds between Weidner and Wittig occurred in a manner in which it could be concealed from others at Capital City [Bank] and from [Capital City's] bank examiners." Wittig App. at 1742. Even though there was no direct evidence that Mr. Wittig ordered the $1.5 million wire transfer to the Arizona company, the evidence permitted the jury to infer at a minimum that he acquiesced in the transfer: Ms. Gurney testified that Mr. Wittig closely monitored his financial transactions at the bank, and there is no indication that he objected to the $1.5 million transfer.

Finally, perhaps the strongest evidence of Mr. Wittig's participation in the concealment of the loan to Mr. Weidner comes from the document that he did prepare and submit to the bank–the January 8, 2002 financial statement that did not list the loan in stating his assets and liabilities. At trial, Mr. Wittig did offer an explanation of this omission: he contended that he did not disclose it because he believed that the bank knew about the loan. He also observed that the financial statement omitted other significant assets and liabilities.

For several reasons, the jury could reasonably have rejected these explanations and found the omission of the loan to demonstrate Mr. Wittig's participation in the conspiracy. First, even though, by January 2002, Ms. Gurney had conveyed to the bank's chief loan officer that Mr. Weidner was the beneficiary of the $1.5 million line of credit increase, there is no evidence that Mr. Wittig knew about that conversation and would have relied on it in failing to disclose the loan. Moreover, Mr. Wittig's January 8, 2002 financial statement did list the line of credit with Capital City Bank. However, the statement described the line of credit solely as a $5.5 million liability of Mr. Wittig; there was no reference to the fact that part of that "liability" was offset by Mr. Weidner's obligation to pay the $1.5 million promissory note. Thus, the jury could view Mr. Wittig's listing of the line of credit as qualitatively different from other assets and liabilities, such as his home mortgage, which were not mentioned at all. Rather

-24-

than an inadvertent omission, the failure to list the loan to Mr. Weidner could be viewed as a knowing concealment of a nominee loan. See United States v. Walker, 871 F.2d 1298, 1309 (6th Cir. 1989) (stating that the fact that a particular document could be read in two ways, one favorable to the defendant and one favorable to the government, did not establish that the district court erred in denying the defendant's motion for a judgment of acquittal because the court was required to view the evidence in the light most favorable to the government).

Viewed as a whole, this evidence permits the conclusion that Mr. Wittig willfully entered into an agreement to violate the bank fraud and money laundering statutes and that he and Mr. Weidner committed overt acts in furtherance of this conspiracy. If one or more of the individual pieces of evidence we have discussed had been lacking, then the conspiracy charge might have required the kind of "inference upon inference" that courts have deemed insufficient. See Valadez-Gallegos, 162 F.3d at 1262. However, the jury here heard evidence of a pattern of concealment of the loan to Mr. Weidner—in the change in terms agreement, in the direct payment of $1.5 million from Mr. Wittig's account to the Arizona real estate investment, and in the omission of the loan to Mr. Weidner on Mr. Wittig's financial statement—sufficient to establish the elements of the conspiracy charge beyond a reasonable doubt.

2. Mr. Weidner

Mr. Weidner challenges his § 371 conviction on related grounds. First, he criticizes the government's quid pro quo theory—that Mr. Wittig loaned the $1.5 million to Mr. Weidner because Mr. Wittig wanted to obtain financing for a new utility company. Mr. Weidner points to evidence that the proposal to create the new company was public knowledge, that financing required participation by other lending institutions, and that, as a result, Mr. Weidner could not personally assure that Mr. Wittig would obtain the needed financing for the new company. Second, Mr. Weidner contends that the loan transaction was not "per se improper," Weidner's Br. at 28, and that the loan was a legitimate way in which Mr. Wittig could further his business interests. He maintains that loans obtained for third parties are not illegal.

These arguments do not persuade us. Although some of the government's quid pro quo evidence was indeed tenuous, the government was not required to prove a specific motive in order to convict the defendants of the charged § 371 conspiracy. See Shively, 715 F.2d at 267 (stating, in a prosecution for the misapplication of bank funds against a bank customer and a bank official under 18 U.S.C. §§ 656 and 1014, that "[i]t is unimportant whether [the customer loaned money to the official] out of pure friendship, or, as is more likely, to ingratiate himself with the officer of a bank with which he did business both as supplier and

as borrower"). The gist of the government's case was that the defendants made false statements so that Mr. Weidner could obtain the loan from Mr. Wittig.

As to Mr. Weidner's contention that loans obtained for third parties are not per se illegal, we agree. See Waldroop, 431 F.3d at 741. However, the government's case was based not merely on Mr. Wittig's obtaining money for a third party but on the concealing of the loan from the bank. Thus, the fact that these loans are not per se illegal does not undermine the government's case.

From the evidence we have discussed, a jury could reasonably conclude that Mr. Weidner willfully entered into a conspiracy with Mr. Wittig to violate the bank fraud and money laundering statutes (§§ 1005 and 1957) and that the two men each committed overt acts in furtherance of that conspiracy. In particular, Ms. Gurney testified that Mr. Weidner directed her to complete the April 27, 2001 loan proposal, and it is undisputed that the proposal omits any reference to the line of credit increase being used to fund a loan from Mr. Wittig to Mr. Weidner. Moreover, on the same day it was deposited into Mr. Wittig's account, the $1.5 million was transferred to the Arizona project in which Mr. Weidner wanted to invest. Additionally, Mr. Weidner acknowledged that his responses to the officer's questionnaire and his personal financial statement made no reference to the $ 1.5 million loan from Mr. Wittig.

We therefore reject Mr. Weidner's sufficiency of the evidence challenge to his § 371 conspiracy conviction.

### B.  Sufficiency of Evidence Supporting § 1005 Bank Fraud Convictions

Both Mr. Wittig and Mr. Weidner challenge their § 1005 bank fraud convictions.   In order to establish a violation of § 1005, the government must establish beyond a reasonable doubt that: "(1) an entry made in bank records is false; (2) the defendant made the entry or caused it to be made; (3) the defendant knew the entry was false at the time he . . .  made it; and (4) the defendant intended that the entry injure or defraud the bank or public officers." United States v. Chaney, 964 F.2d 437, 448 (5th Cir. 1992).  The Supreme Court has described the aim of the statute as "giv[ing] assurance that upon an inspection of a bank, public officers and others would discover in its books of account a picture of its true condition." United States v. Darby, 289 U.S. 224, 226 (1933); see also United States v. Cordell, 912 F.2d 769, 773 (5th Cir. 1990) (citing Darby for the same proposition).

Under § 1005, "an omission of material information qualifies as a false entry." Cordell, 912 F.2d at 773; see also United States v. Copple, 827 F.2d 1182, 1187 (8th Cir. 1987) ("[A]n omission where an honest entry would otherwise be made can be a false entry for section 1005 purposes.").  "The entry is rendered no less false simply because, through considerable effort and a piecing

-28-

together of minute details, the bank might have been able to discover the truth."

United States v. Luke, 701 F.2d 1104, 1108 n.7 (4th Cir. 1983); see, e.g., Phillips

v. United States, 406 F.2d 599, 601 (10th Cir. 1969) (affirming a § 1005

conviction based upon nominee loans and loans to fictitious parties even though

microfilm bank records revealed the true nature of the transactions and stating

that "the fact that [an entry's] falsity may be exposed by an examination of other

books of account, does not render it any less a false entry made with intent to

deceive" (internal quotation marks and citation omitted)).  Additionally, the

defendant himself need not make the false entries in bank records; "it suffices

that he set in motion management actions that necessarily caused [bank personnel]

to make false entries."  United States v. Wolf, 820 F.2d 1499, 1504 (9th Cir.

1987).

    With those principles in mind, we turn to each defendant's challenge to the

§ 1005 convictions.  As set forth above, there are four allegedly false entries at

issue: (1) the April 27, 2001 loan proposal stating that Mr. Wittig was requesting

a $1.5 million increase in his line of credit to renovate the Landon Mansion and

make business investments (count 2); (2) Mr. Weidner's May 14, 2001 responses

to the FDIC's questionnaire (count 3); (3) Mr. Weidner's annual financial

statement, submitted to Capital City Bank on May 31, 2001 (count 4); and (4) Mr.

Wittig's January 8, 2002 financial statement (count 5). These documents do not contain any reference to a $1.5 million loan from Mr. Wittig to Mr. Weidner.

1. Mr. Wittig

    a. application of § 1005 to bank customers

In challenging his § 1005 convictions, Mr. Wittig first invokes the Third Circuit's decision in United States v. Barel, 939 F.2d 26, 38-41 (3d Cir. 1991). There, the court held that a defendant who had submitted false information about his social security number in opening an account could not be prosecuted under section 1005 because "the legislative history . . . shows that Congress intended the statute to apply only to bank insiders or their accomplices." Id. at 39 (emphasis added). The court also held that under the particular facts of the case, the defendant could not be convicted under an aiding or abetting theory. See id. at 42 (concluding that "[the defendant's] acts causing bank employees to make false entries in the bank's books, although intentional in the general sense of the word, were merely a byproduct of his specific intent to defraud his wife").

Barel does not foreclose the government's prosecution of Mr. Wittig for violating § 1005 because, unlike the prosecution in that case, the government here alleged (and the jury found) that Mr. Wittig conspired with a bank official to make false bank entries in violation of the statute. Many courts, including this one, have held that a bank customer may be convicted of violating § 1005, and

other federal bank fraud statutes, if he or she conspires with a bank official or aids and abets the official's violation of the statute. See, e.g., Phillips, 406 F.2d at 601-02 (affirming a § 1005 conviction of a bank customer on the grounds that he aided and abetted a bank president in making false entries); see also Copple, 827 F.2d at 1186 (affirming convictions of bank customers under § 1005 and other federal bank fraud statutes and stating that "[the] [d]efendants have been charged with aiding and abetting and conspiring with [a bank officer who] held a position sufficient to trigger jurisdiction of the statutes specified in the indictment"); Luke, 701 F.2d at 1108 (affirming bank customers' convictions for aiding, abetting and causing the making of a false entry in bank records, in violation of 18 U.S.C. §§ 2 and 1005).

Thus, Mr. Wittig's status as a bank customer did not bar his prosecution under § 1005.

b. participation in conduct alleged in counts 2-4

Mr. Wittig directs another challenge at counts 2-4, which involve the April 27, 2001 loan proposal, Mr. Weidner's May 14, 2001 response to the officer's questionnaire, and Mr. Weidner's May 31, 2001 financial statement. He notes that these documents were prepared by Mr. Weidner and Ms. Gurney, and he contends that there was no evidence that he aided and abetted in the preparation and submission of these documents.

As we have observed above, in order to convict a defendant of a violation of § 1005, the government is not required to prove that the defendant made the false bank entries himself. See Wolf, 820 F.2d at 1504. A defendant may be convicted of a § 1005 charge if he or she conspires with or aids and abets a bank official's making of a false entry. See, e.g., Copple, 827 F.2d at 1186; Phillips, 406 F.2d at 601-02. Here, the evidence we have discussed in addressing Mr. Wittig's challenge to the conspiracy convictions provides sufficient support for the § 1005 convictions alleged in counts 2-4. The loan proposal, questionnaire responses, and personal financial statement addressed in those counts all failed to disclose the loan from Mr. Wittig to Mr. Weidner. Based on those omissions, a jury could reasonably conclude that the submission of each document was an overt act committed in furtherance of the conspiracy charged in count 1. Because the evidence is sufficient to support the conclusion that Mr. Wittig was a member of that conspiracy, a jury could properly convict him for the submission of the documents addressed in counts 2-4, even though he did not personally prepare those documents. See United States v. Russell, 963 F.2d 1320, 1322 (10th Cir. 1992) ( "During the existence of a conspiracy, each member of the conspiracy is legally responsible for the crimes of fellow conspirators . . . that are committed in furtherance of the conspiracy.") (citing Pinkerton v. United States, 328 U.S. 640, 646-49 (1946)).

c.  statements alleged in count 2

Mr. Wittig also argues that, contrary to the allegations of count 2, the statements in the April 27, 2001 loan proposal were not false.  He observes that the loan proposal stated one of the purposes of the $1.5 million increase in his line of credit was to "make business investments."  Wittig App. at 524. According to Mr. Wittig, his $1.5 million loan to Mr. Weidner, on which he charged 7 percent interest, was such a "business investment," and thus the loan proposal did not contain a false statement.

But the policy underlying § 1005 is to ensure that an inspection of the bank's books will yield an accurate picture of its condition.  Darby, 289 U.S. at 226; Cordell, 912 F.2d at 773.  As a result, a material omission from a document may constitute a false entry.  Cordell, 912 F.2d at 773 (stating that "an omission of material information relating to matters which should be disclosed in order to show a true picture of the transactions involved, as well as an actual misstatement, qualifies as a false entry under the statute").  Here, even though, in broad terms, one could arguably characterize Mr. Wittig's loan to Mr. Weidner as a "business investment," the proposal addressed in count 2 omitted a key material fact about the requested line of credit increase for Mr. Wittig–that it was really for Mr. Weidner, who wanted to use it for an investment that Mr. Wittig had

expressly turned down. Thus, the government presented sufficient evidence of a false entry under § 1005.

### d. count 5

Mr. Wittig addresses another sufficiency-of-the-evidence challenge directly at count 5, which concerns his January 8, 2002 financial statement. He argues that, for two reasons, the government failed to prove that he submitted that document with the intent to defraud the bank and that the evidence is therefore insufficient to support this particular § 1005 count.

First, Mr. Wittig observes, Mr. Weidner already knew about the $1.5 million loan he had received from Mr. Wittig. Thus, Mr. Wittig argues, the omission of that loan from Mr. Wittig's own financial statement merely demonstrates that he failed to disclose information that would have been pointless to disclose. Second, Mr. Wittig contends that when he submitted the financial statement, Ms. Gurney had already told the bank's chief lending officer about the loan to Mr. Weidner.

Again, we are not persuaded. Congress passed § 1005 to protect the integrity of the bank's records. See Darby, 289 U.S. at 226; Cordell, 912 F.2d at 773. Thus, the fact that a particular bank official, like Mr. Weidner, is aware of certain information not disclosed in a document does not foreclose a finding of the necessary intent to defraud. See Chaney, 964 F.2d at 449 (stating that "[t]he

-34-

government need not prove intent to cause the bank injury; all that is required [under § 1005] is that the defendant intended to defraud <u>one or more</u> of the bank's officers, auditors, examiners, or agents" (emphasis added)).  As to the fact that Ms. Gurney had disclosed the Wittig/Weidner loan to the bank's chief lending officer three months before Mr. Wittig filed his financial statement, we have previously noted that there is no evidence that Mr. Wittig himself knew about that disclosure.  Thus, despite Ms. Gurney's disclosure, the jury could still have reasonably concluded that Mr. Wittig's failure to list the loan demonstrated the intend to defraud necessary to support his § 1005 conviction as to count 5.

2.  Mr. Weidner

Mr. Weidner challenges his convictions for the § 1005 violations alleged in counts 2 and 5—the April 27, 2001 loan proposal and Mr. Wittig's January 8, 2002 financial statement.  He invokes his own testimony that he believed that the funds for the Arizona investment were to come from funds other than those in Mr. Wittig's Capital City accounts.  That belief, he contends, demonstrates that he lacked an intent to defraud.  Then, as to count 2, Mr. Weidner advances the same argument as Mr. Wittig—that it was proper to describe the purpose of the initial loan as "business investments."  Wittig App. at 524.

Neither argument has merit.  Even though Mr. Weidner testified that he did not intend to use Mr. Wittig's $1.5 million line of credit increase as the funding

-35-

for the Arizona real estate investment, the jury was not required to believe him. As the district court explained, there was sufficient circumstantial evidence from which a reasonable juror could conclude that Mr. Weidner and Mr. Wittig did intend to use the $1.5 million line of credit increase for Mr. Weidner's real estate investment. In particular, the $1.5 million was deposited in Mr. Wittig's account and then on the same day transferred to the Arizona title company managing the real estate transactions in which Mr. Weidner wanted to invest. There is no indication that Mr. Wittig objected to that transfer, and, on the following day, Mr. Weidner signed a promissory note obligating him to pay $1.5 million plus interest to Mr. Wittig.

As to the fact that the April 27, 2001 loan proposal referred to "business investments," id., we have already noted that, despite the use of that phrase, the failure to disclose that Mr. Weidner was the real borrower supports the jury's finding that Mr. Wittig possessed the necessary intent to defraud. The same is true of Mr. Weidner.

We therefore conclude that the evidence is sufficient to support Mr. Weidner's § 1005 convictions alleged in counts 2 and 5.

C. Sufficiency of Evidence Supporting § 1957 Money Laundering Convictions

Mr. Wittig and Mr. Weidner also challenge the sufficiency of the evidence supporting their money laundering convictions under 18 U.S.C. § 1957. Section

1957(a) prohibits "knowingly engag[ing] . . . in a monetary transaction in criminally derived property [that] is derived from specified unlawful activity." To establish a violation of § 1957, the government must prove that the defendant (1) engaged or attempted to engage, (2) in a monetary transaction, (3) in criminally-derived property, (4) knowing that the property was derived from unlawful activity, and (5) the property is, in fact, derived from specified unlawful activity. United States v. Massey, 48 F.3d 1560, 1565 (10th Cir. 1995).

"In a prosecution for an offense under this section, the Government is not required to prove the defendant knew that the offense from which the criminally derived property was derived was specified unlawful activity." 18 U.S.C. § 1957(c). In other words, "[t]he knowledge element of the offense requires that the defendant know that the property in question is 'criminally derived,' although it does not require knowledge that the property was derived from 'specified unlawful activity.'" United States v. Allen, 129 F.3d 1159, 1164 (10th Cir. 1997) (quoting United States v. Pettigrew, 77 F.3d 1500, 1513 (5th Cir. 1996)).

1. Mr. Wittig

Mr. Wittig's § 1957 money laundering conviction is based upon the wire transfer of funds from his Capital City account to the Arizona title company on April 30, 2001. In challenging the evidence supporting this conviction, Mr. Wittig advances arguments similar to those he offers in attacking his § 371

conspiracy conviction. Mr. Wittig argues that these funds were not "criminally derived" and that, in the alternative, there is no evidence that he knew that the funds were criminally derived.

We are not persuaded by Mr. Wittig's contentions. As the government notes, the evidence supporting the § 371 conspiracy and § 1005 convictions also supports the money laundering conviction. Because a jury could reasonably conclude that Mr. Wittig concealed the purpose of the line of credit increase he obtained from the bank, a jury could also conclude that the funds that were transferred by Mr. Wittig on April 30, 2001 were criminally derived. Accordingly, the evidence is sufficient to support Mr. Wittig's § 1957 money laundering conviction.

2. Mr. Weidner

Mr. Weidner also challenges his § 1957 money laundering conviction. His argument here is dependent on his challenge to the § 371 conspiracy conviction and to the § 1005 conviction alleged in count 2. In particular, Mr. Weidner notes that a money laundering conviction requires an underlying criminal activity. Here, he contends, there was no underlying crime because there was no evidence from which a jury could conclude that, at the time the $1.5 million was transferred to the Arizona title company, he intended to conceal from bank officials the loan that he had obtained from Mr. Wittig.

Mr. Weidner's challenge lacks merit. Ms. Gurney testified that it was Mr. Weidner who instructed her how to complete the April 27, 2001 loan proposal. That proposal did not disclose that the $1.5 million increase in Mr. Wittig's line of credit was intended for Mr. Weidner's real estate investment in Arizona. Moreover, the $1.5 million that Mr. Wittig loaned to Mr. Weidner was not transferred directly to Mr. Weidner but instead was routed to the Arizona title company managing the transaction in which Mr. Weidner wanted to invest. Ms. Gurney testified that she did not make that transfer and that Mr. Weidner had the authority and the ability to make such a wire transfer himself. From the manner in which the $1.5 million was transferred from Mr. Wittig's account to Mr. Weidner's Arizona real estate investment, the jury could conclude that Mr. Weidner intended to conceal from bank officials that he was the real borrower of the $1.5 million advanced by Capital City Bank. Thus, the evidence was sufficient to support the jury's finding that Mr. Weidner knowingly engaged in a transaction involving criminally derived property in violation of § 1957.

D. Evidence of Mr. Wittig's Wealth and Executive Employment Agreement

Mr. Wittig challenges the district court's admission of exhibits 31 and 52, arguing that they were unduly prejudicial and that, as a result, he is entitled to a

new trial. "We review a district court's evidentiary rulings for abuse of discretion." United States v. Curtis, 344 F.3d 1057, 1067 (10th Cir. 2003).

Under that standard, "a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." McEwen v. City of Norman, 926 F.2d 1539, 1553-54 (10th Cir. 1991) (internal quotation marks omitted). Our deference to the trial court is based upon its first-hand ability to view the witnesses and evidence and assess credibility and probative value. Id. at 1554. "An abuse of discretion occurs when the district court's decision is arbitrary, capricious, or whimsical, or results in a manifestly unreasonable judgment." Moothart v. Bell, 21 F.3d 1499, 1504-05 (10th Cir. 1994) (internal quotation marks omitted). Even "[i]f we find error in the admission of evidence, we will set aside a jury verdict only if the error prejudicially affects a substantial right of a party." Coletti v. Cudd Pressure Control, 165 F.3d 767, 776 (10th Cir. 1999) (internal quotation marks omitted).

The first document to which Mr. Wittig objects, exhibit 31, is an employment agreement between Western Resources and Mr. Wittig, dated September 19, 2000. At trial, the government contended that this agreement demonstrated that Mr. Wittig would greatly benefit from the creation of a new utility company and that, because Mr. Wittig was seeking funding from Mr.

Weidner's bank, the agreement supplied a motive for Mr. Wittig's allowing his line of credit to be used to provide the $1.5 million loan to Mr. Weidner.

The second document at issue, exhibit 51, is an overview of the benefits that would flow to executives in the new utility company. The government contended at trial that the document indicated that Mr. Wittig would receive between $37 million and $64 million. Again, the government asserted that the opportunity available to Mr. Wittig to receive these substantial sums explained why Mr. Wittig declined to invest in the Arizona real estate project himself and opted instead to curry favor with Mr. Weidner, whose bank would be able to finance the creation of the lucrative new utility company.

Mr. Wittig contends that both documents were irrelevant and prejudicial. According to Mr. Wittig, the government "trumpeted these documents in an attempt to prejudice the jury with arguments about a potential multimillion dollar payout scenario, bonuses, stock options, and split-dollar life insurance, as well as the value of the Wittigs' extensively renovated home in Topeka and a New York apartment they maintained." Wittig's Br. at 30.

Mr. Wittig further contends that the government failed to establish that he needed Mr. Weidner's assistance in obtaining financing for the new utility company. He points to evidence that the new utility company had great profit potential for the bank and that, as a result, Mr. Wittig did not need Mr. Weidner's

help in obtaining the financing. Moreover, he notes, any decision with respect to the financing at issue would have been referred to a committee because Mr. Weidner lacked the authority to personally approve it. Finally, Mr. Wittig observes that the proposed transaction creating the new utility never came to fruition.

To a degree, Mr. Wittig's points are well-taken. The government's quid pro quo theory involved a substantial amount of speculation and in fact was unnecessary to prove the counts against Mr. Wittig, which involved the loan to Mr. Weidner, not the creation of the new utility. Cf. Shively, 715 F.2d at 266 (noting, in a prosecution for conspiracy to misapply bank funds in violation of 18 U.S.C. §§ 371, 656, and 1014, that the motivation of a customer in loaning money to a bank official was irrelevant—"whether he did so out of pure friendship, or, as is more likely, to ingratiate himself with the officer of a bank with which he did business"). Moreover, even without the evidence of the potential benefits from the new utility company, the government introduced evidence that Mr. Wittig was benefitting from the loan to Mr. Weidner: Mr. Weidner was paying Mr. Wittig a higher interest rate than Mr. Wittig was paying the bank.

Nevertheless, we cannot conclude that the district court abused its discretion in admitting this evidence. The evidence of the lucrative benefits from the new utility company was of some relevance: it did indicate that Mr. Wittig

had an interest in cultivating a good relationship with Mr. Weidner.  The evidence invoked by Mr. Wittig does not foreclose the government's allegation that Mr. Wittig sought to cultivate Mr. Weidner's good will and that one way of obtaining that good will was to loan Mr. Weidner the $1.5 million.  Moreover, Mr. Wittig has not established the necessary prejudice to warrant reversal of his conviction. See Coletti, 165 F.3d at 776 (noting "[i]f [this court] find[s] error in the admission of evidence, [it] will set aside a jury verdict only if the error prejudicially affects a substantial right of a party" (internal quotation marks omitted)).

### E.  Jury Instruction Errors Alleged by Mr. Wittig

Mr. Wittig challenges the district court's jury instructions on three grounds. We review a district court's decision to give a particular jury instruction for an abuse of discretion.    Osteguin v. S. Pac. Transp. Co.    , 144 F.3d 1293, 1295 (10th Cir. 1998).  However, we review de novo whether, considering the instructions as a whole, the jury was misled.     Wilson v. Muckala  , 303 F.3d 1207, 1214 (10th Cir. 2002).  "In reviewing such allegations, this court examines the record as a whole to determine whether the instructions state the applicable law and provide the jury with an appropriate understanding of the issues and the legal standards to apply." Faulkner v. Super Valu Stores    , 3 F.3d 1419, 1424 (10th Cir. 1993).

1.  Allowing a Bank Customer to Be Convicted of a § 1005 Violation

Mr. Wittig argues that the jury instructions allowed him to be convicted of the § 1005 violations based on a finding that he acted alone, solely as a bank customer. Again invoking the Third Circuit's decision in Barel, he maintains that the statute does not authorize prosecutions based on such a theory. Although Mr. Wittig acknowledges that the jury was also instructed that he could be convicted of the § 1005 violations on an aiding and abetting or a conspiracy theory, he contends that one cannot determine whether the jury relied on these theories or on the theory that he acted alone as a bank customer.

Mr. Wittig's challenge is based on the Supreme Court's decision in Yates v. United States, 354 U.S. 298 (1957), overruled on other grounds by Burks v. United States, 437 U.S. 1 (1978). In Yates, the Court held that a verdict must be set aside "where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." Id. at 312. In a subsequent decision, the Court limited that holding to instances in which one of the possible bases of conviction was legally insufficient as opposed to factually insufficient. See Griffin v. United States, 502 U.S. 46, 58-59 (1991) (discussing Yates).

Here, even assuming that Mr. Wittig is correct in arguing that a bank customer cannot be prosecuted for a direct violation of § 1005, he has not

-44-

established that his § 1005 convictions are invalid. The jury was also instructed that Mr. Wittig could be liable for violating § 1005 as an aider or abettor or as a conspirator, and from a review of the instructions, evidence, and arguments of counsel, it is clear that it the jury relied on those theories in convicting Mr. Wittig of the § 1005 violations.

In particular, as to counts 2-4, the government, as Mr. Wittig himself contends, offered no evidence that Mr. Wittig submitted the documents at issue (the loan proposal, the questionnaire responses, and Mr. Weidner's financial statement). Thus, the only basis on which the jury could have found Mr. Wittig responsible for these violations was on an aiding and abetting or conspiracy theory.

As to count 5, the government alleged that Mr. Wittig's submission of his January 8, 2002 financial statement was an overt act carried out in furtherance of the conspiracy. The fact that the jury convicted Mr. Weidner on that count demonstrates that it found that Mr. Wittig's overt act of submitting his own financial statement was done in furtherance of the conspiracy. There was no evidence that Mr. Weidner was involved in the preparation and submission of that document, and so a conspiracy theory is the only theory on which the jury could have relied in convicting Mr. Weidner of that count. Because the jury necessarily found that Mr. Wittig's submission of his own financial statement was done in

furtherance of the conspiracy, there is no risk that the jury relied solely on the allegedly invalid theory that Mr. Wittig committed the violation alleged in count 5 by acting alone as a bank customer. See United States v. Hudgins, 120 F.3d 483, 488 n.3 (4th Cir. 1997) (noting that Yates "requires reversal only where it is impossible to tell that the bad ground was not the sole basis for the verdict" (emphasis added) (internal quotation marks omitted)).

2. Instructing on Pinkerton Conspiracy Theory

Mr. Wittig next challenges the district court's Pinkerton instruction insofar as it concerned count 5, the § 1005 false bank entry charge that addresses Mr. Wittig's submission of his own financial statement on January 8, 2002. Mr. Wittig argues that, as to that count, no conduct by Mr. Weidner was charged or argued. As a result, Mr. Wittig contends, the district court's Pinkerton instruction improperly allowed Mr. Wittig to be convicted for the conduct of a bank official.

Mr. Wittig's § 1005 conviction under count 5 was not based upon the Pinkerton doctrine. That doctrine provides that one conspirator can be found guilty of crimes committed by another conspirator in furtherance of the conspiracy. See Russell, 963 F.2d at 1322. Here, it was Mr. Wittig, not his co-conspirator, who committed the act alleged in count 5 by submitting his own financial statement. As we have noted, bank customers who conspire or aid and abet bank officials may be convicted under § 1005. See, e.g., Copple, 827 F.2d at

1186; <u>Luke</u>, 701 F.2d at 1108; <u>Phillips</u>, 406 F.2d at 601-02. Thus, there is no instructional error here.

3. Refusal to Give Instruction Regarding Third Party Loans

In a final challenge to the jury instructions, Mr. Wittig argues that the district court erred in refusing to give an instruction stating that "nominee loans" (loans on behalf of a third person) are not per se illegal.

We discern no grounds for reversal here. Viewed as a whole, the instructions properly focused the jury on the key issue–whether Mr. Wittig and Mr. Weidner misled Capital City Bank officials. As the government persuasively argues, to have given the jury a simple instruction that nominee loans are not per se illegal would have been an incomplete statement of the law: nominee loans are illegal when the borrower and bank officer make false statements or omit material information in order to obtain the funds. Whether the defendants made such statements and omitted such information was the issue contested here, and Mr. Wittig's per se instruction was not necessary to inform the jury of the relevant legal principles.

## F.  Allocation of Loan Proceeds in Determining Amount of Loss

### 1.  Mr. Wittig's challenge

In the first of his challenges to his sentence, Mr. Wittig argues that the district court erred in applying the "gross receipts" provision of the Guidelines in determining the amount of loss and arriving at an offense level.  His argument concerns the proper interpretation of the Guidelines, and we therefore engage in de novo review.   United States v. Brown   , 314 F.3d 1216, 1222 (10th Cir. 2003).

USSG § 2B1.1(b)(12) provides that:

> (Apply the greater) If—
>
> (A)  the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by 2 levels;
>
> (B)  the offense substantially jeopardized the safety and soundness of a financial institution, increase by 4 levels.
>
> If the resulting offense level determined under subdivision (A) or (B) is less than level 24, increase to level 24.

The commentary to the Guidelines provides a definition of "gross receipts":

> Gross Receipts Enhancement Under Section (b)(12)(A)
>
> (A)  In General -For purposes of subsection (b)(12)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000.

(B)     Definition-"Gross receipts from the offense" includes all property, real or personal, tangible or intangible, which is obtained directly or indirectly as a result of such offense. See 18 U.S.C. § 982(a)(4).[1]

USSG § 2B1.1 cmt. n.9 (2001) (emphasis added).

At sentencing, the district court relied on § 2B1.1(b)(12) to conclude that, by receiving the $1.5 million increase in his line of credit before the funds were transferred to Mr. Weidner's real estate investment in Arizona, Mr. Wittig received gross receipts of more than $1 million.

Mr. Wittig now contends that the district court erred because it also attributed the same $1.5 million in receipts to Mr. Weidner. This double attribution, Mr. Wittig maintains, is inconsistent with the principle set forth in the Guideline commentary that, in order for the enhancement to level 24 to apply, "the gross receipts to the defendant individually, rather than to all participants, exceeded $1,000,000." Id.

Mr. Wittig invokes a line of cases applying this Guideline provision and concluding that "no part of the amount found to have been derived by one defendant can be counted as having been derived by another defendant." United States v. Kohli, 110 F.3d 1475, 1477 (9th Cir. 1997); see also United States v. Castellano, 349 F.3d 483, 486 (7th Cir. 2003) (applying § 2B1.1(b)(12) and

---

[1] That statute contains the same definition of "gross receipts."

concluding that the defendant must receive proceeds "individually"); United States v. Nesenblatt, 171 F.3d 1227, 1229-30  (9th Cir. 1999) (same); United States v. Millar, 79 F.3d 338, 346 (2d Cir. 1996) (remanding "for factual findings to establish the amount of gross receipts [that the defendant] derived individually--not jointly").

In response, the government invokes a Third Circuit decision stating that "it is irrelevant how [the defendant] spent the money [i.e., "the gross receipts"] of the offense, once he obtained it."  United States v. Bennett, 161 F.3d 171, 193 (3d Cir. 1998).  Thus, the government's position is that Mr. Wittig himself received more than $1 million in gross receipts of the offense, and that the fact that Mr. Wittig chose to loan this money to Mr. Weidner is irrelevant.

In our view, the various decisions cited by Mr. Wittig and the government are distinguishable from the instant case in important respects.  The decisions upon which Mr. Wittig relies do indicate that the same receipts cannot be counted against more than one defendant.  However, unlike this case against Mr. Wittig and Mr. Weidner, none of these cases involved a series of offenses in which each defendant successively used the receipts in a separate fashion (with one defendant, Mr. Wittig, obtaining money from a bank and then earning interest by loaning that money to his codefendant Mr. Weidner, and the codefendant, Mr. Weidner, using the proceeds of the loan to profit from a real estate investment).

Conversely, the Third Circuit decision on which the government relies does not involve the attribution of the same receipts to codefendants or to the defendant and another person who somehow participated in the criminal scheme. In <u>Bennett</u>, the defendant argued that he did not receive certain receipts of the offense of conviction "because he subsequently transferred much of the money to consultants and others who did work for [his company]." <u>Id.</u> In rejecting that argument, the Third Circuit did state that "it is irrelevant how [the defendant] spent the money after he obtained it." <u>Id</u>. However, there is no indication in the Third Circuit's opinion that the individuals to whom the defendant transferred the receipts were codefendants or otherwise participated in the criminal scheme. Thus, <u>Bennett</u> does not offer the government a way around the Guideline language stating that the sentencing court may consider "gross receipts to the defendant individually, rather than to all <u>participants</u>." USSG § 2B1.1 cmt. n.9 (2001) (emphasis added).

In light of the ambiguity of the Guideline language, the lack of case law resolving the issue of how to attribute receipts in these circumstances, and the lack of a persuasive argument from the government, we conclude that the district court erred in attributing the $1.5 million in gross receipts to both Mr. Wittig and Mr. Weidner. <u>See</u> <u>Castellano</u>, 349 F.3d at 486 (discussing § USSG 2B1.1(b)(12) and stating that "[n]othing in the Sentencing Guidelines specifies what it means to

receive proceeds 'individually'"); United States v. Gay, 240 F.3d 1222, 1232

(10th Cir. 2001) ("The rule of lenity requires courts to interpret ambiguous

statutes, including the Sentencing Guidelines, in favor of criminal defendants.").[2]

Prior to the Supreme Court's decision in Booker, our conclusion that a

Guideline provision was ambiguous required us to remand with instructions to

follow the interpretation of the Guidelines that would produce the lesser sentence.

See United States v. Bazile, 209 F.3d 1205, 1207 (10th Cir. 2001). Post- Booker,

however, our approach is somewhat different. In particular, after Booker, the

district courts are "[r]elieved of the mandatory application of the guidelines" and

"are now permitted to give more sway in sentencing to the factors enumerated in

18 U.S.C. § 3553(a)." United States v. Resendiz-Patino, 420 F.3d 1177, 1184 n.6

(10th Cir. 2005).

The § 3553(a) factors include "the nature and circumstances of the

offense." 18 U.S.C. § 3553(a)(1). In our view, the circumstances of these

offenses include those noted by the government here—that Mr. Wittig and Mr.

Weidner each used the $1.5 million from the line of credit increase in different

---

[2] In its appellate brief, the government also argues that Mr. Wittig obtained additional gross receipts from the offenses. The government cites interest on the promissory note from Mr. Weidner (more than $90,000) as well as the two additional $500,000 increases in his line of credit that Mr. Wittig obtained in May and June 2001. See Aple's Br. at 43. However, the district court did not rely on these transactions in determining the amount of gross receipts received by Mr. Wittig, and we decline to consider these transactions for the first time on appeal.

ways and derived some benefit from it. Thus, the district court may properly

consider this aspect o f the offenses in resentencing under the post-<u>Booker</u> regime.

<u>2. Mr. Weidner's challenge</u>

Mr. Weidner makes only a cursory challenge to the gross receipts

enhancement of his sentence. He argues that because the loan from Mr. Wittig

arose out of "a legitimate borrower/lender relationship," Wittig's Br. at 33, the

$1.5 million was obtained from Mr. Wittig and not from "a financial institution,"

as required by USSG § 2B1.1(b)(12).

This argument merely restates Mr. Weidner's challenge to the sufficiency

of the evidence. As we have noted, there was ample evidence from which the

district court could conclude that the $1.5 million transferred to Mr. Weidner's

Arizona real estate investment was funded by the $1.5 million increase in Mr.

Wittig's line of credit. Thus, the district court properly concluded that the $1.5

million was obtained from a financial institution.

G. Significance of Collateral in Determining Amount of Loss

Mr. Wittig and Mr. Weidner also challenge the district court's

determination of the amount of loss under an intended loss theory. They invoke

the commentary to USSG § 2B1.1, which defines "[i]ntended loss" as:

> (I) . . . the pecuniary harm that was intended to result from
> the offense; and (II) includes intended pecuniary harm that

> would have been impossible or unlikely to occur ( e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

USSG § 2B1.1 cmt. n.2(A)(ii) (2001).

Here, the district court found that both defendants intended a loss of $1.5 million. In reaching this conclusion, the court did not consider the value of the collateral that Mr. Wittig had pledged to secure his line of credit. The court reasoned that, when he had obtained the $1.5 million increase on April 30, 2001, Mr. Wittig had pledged no new collateral, and that even considering the collateral that he had previously pledged for the line of credit, the amount was still below the loan-to-value ratio required by the bank. See Wittig App. at 2639-40; Weidner App. at 622.

Mr. Wittig and Mr. Weidner contend that the district court erred by not considering the fact that Mr. Wittig provided adequate collateral for the $1.5 million increase in his line of credit. They note that this circuit "has . . . required that the value of security given for a loan be taken into account in determining intended loss." United States v. Schild, 269 F.3d 1198, 1201 (10th Cir. 2001); see also United States v. Nichols, 229 F.3d 975, 980 (10th Cir. 2000) ("The security of [a] loan is a valid consideration in evaluating a defendant's realistic intent and the probability of inflicting the loss."). In response, the government has chosen not to argue in support of the district court's disregard of the collateral

-54-

provided by Mr. Wittig, instead arguing only that the amount of loss determination is proper under the gross receipts approach that we have addressed above.

From a review of the record, we conclude that the district court did not adequately consider the amount of collateral provided by Mr. Wittig in determining the amount of loss under an intended loss theory. Although there are instances in which a district court may ignore collateral in determining intended loss, the court must first determine that the defendant intended to deprive the lender of its collateral. See United States v. Williams, 292 F.3d 681, 686 (10th Cir. 2002) (stating that "we have upheld a finding of intended loss of an entire loan amount where the record indicated the defendant intended to permanently deprive the lender of security by concealing pledged collateral").

The district court did not make such findings. The facts noted by the district court—that Mr. Wittig provided no new collateral for the $1.5 million increase in his line of credit and that amount of collateral provided did not comport with the bank's rules—might justify the disregard of some of the collateral pledged. However, absent further explanation and findings, we cannot see how those facts justify a disregard of all the collateral pledged by Mr. Wittig in calculating the amount of intended loss.

Accordingly, we conclude that the district court also erred in calculating the amount of loss under the intended loss approach.

### H.  Booker Error

Mr. Wittig and Mr. Weidner both argue that their sentences are invalid under Booker.  Because we have already concluded that the district court erred in applying the gross receipts and intended loss provisions of the Guidelines, we need not address this contention as to Mr. Wittig.  See United States v. Cano-Silva, 402 F.3d 1031, 1039 (10th Cir. 2005) (stating that "we need not address any issues related to . . .  Booker since we have already determined that the case must be remanded for resentencing").  Mr. Wittig is entitled to resentencing under the post-Booker regime.  See Williams v. United States, 503 U.S. 193, 203 (1992) (stating that "once the court of appeals has decided that the district court misapplied the Guidelines, a remand is appropriate unless the reviewing court concludes, on the record as a whole, that the error was harmless").

However, unlike Mr. Wittig, Mr. Weidner has not argued that the district court erred in attributing the $1.5 million to both defendants under the gross receipts theory of calculating the offense level.  As the district court and the government have observed, the gross receipts theory provided an alternative to the intended loss approach in determining Mr. Weidner's base offense level. Thus,

lacking a convincing challenge from Mr. Weidner to the district court's gross receipts determination, we must address his <u>Booker</u> claim.

Because Mr. Weidner did not raise this claim before the district court, he is only entitled to resentencing if he establishes that the mandatory application of the Guidelines was plain error. See <u>Dazey</u>, 403 F.3d at 1173. To establish plain error, Mr. Weidner must demonstrate that the district court (1) committed error, (2) that was plain, and (3) that affected his substantial rights. <u>United States v. Cotton</u>, 535 U.S. 625, 631 (2002); <u>Dazey</u>, 403 F.3d at 1174. If he makes this showing, then we must proceed to a fourth inquiry, asking whether the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. <u>Cotton</u>, 535 U.S. at 631-32; <u>Dazey</u>, 403 F.3d at 1174.

Our post-<u>Booker</u> cases have distinguished between constitutional and non-constitutional <u>Booker</u> error. See <u>United States v. Gonzalez-Huerta</u>, 403 F.3d 727, 731-32 (10th Cir. 2005). Here, the error alleged by Mr. Weidner is constitutional: the district court based its amount-of-loss determinations on facts not found by the jury. See <u>Dazey</u>, 403 F.3d at 1174 (noting that the district court committed constitutional <u>Booker</u> error because the sentencing judge relied on facts "found by a preponderance of the evidence to increase [the defendant's] sentence beyond the maximum authorized by the facts established by the jury's verdict"). Because the

error was constitutional, we apply a less stringent standard of plain error review. Id.

The first two parts of the plain error inquiry merit only brief discussion. The district court based Mr. Weidner's sentence on facts not found by the jury and therefore violated his Sixth Amendment rights under Booker. Thus, the court committed plain error. See id. at 1174-75.

As to the third part of the inquiry, we conclude that Mr. Weidner has established that the Booker error affected his substantial rights. The district court's finding as to the amount of loss was a key component of the sentencing decision, resulting in an increase in the offense level from six to twenty-four. Without the amount-of-loss findings, the Guideline range would have been six to twelve months, rather than seventy-eight to ninety- seven months. See USSG Ch. 5, pt. A (Sentencing Table) (2001). Moreover, Mr. Weidner contested the government's allegations. Cf. Dazey, 403 F.3d at 1177 (noting that, at sentencing, the defendant "strenuously contested the factual basis for the sentencing enhancements" and concluding as a result that he had established a reasonable probability of a different result absent the Booker error). Thus, there is a reasonable probability that a jury (charged with applying the beyond-a-reasonable-doubt standard to the determination of the amount of loss) would not have found either that $1.5 million in gross receipts was attributable to both Mr.

Wittig and Mr. Weidner or that, as to each defendant, the intended loss was $1.5 million.

Finally, we conclude that Mr. Weidner has satisfied the fourth part of the inquiry—that the error affected the integrity, fairness, or public reputation of the proceedings. In <u>Dazey</u>, we set forth three justifications for exercising our discretion to correct a <u>Booker</u> error: (1) the error was constitutional, "which entails a less rigorous application of the plain error burden[;]" (2) "[the defendant] vigorously contested the judge-found facts that enhanced his sentence[;]" and (3) the judge-found facts substantially increased the defendant's sentence. <u>Id.</u> at 1178. As noted above, all three factors are present here. As in <u>Dazey</u>, "allowing a substantial increase in [a defendant's] sentence through the now-suspect practice of mandatory enhancements, based on judge-found facts, runs the risk of impugning the integrity and reputation of judicial proceedings." <u>Id.</u> at 1179.

Accordingly, we conclude that the plain error here warrants the exercise of our discretion to remand Mr. Weidner's case for resentencing under the post-<u>Booker</u> sentencing regime.

## III. CONCLUSION

We AFFIRM the convictions of Mr. Wittig and Mr. Weidner. However, for the reasons set forth in this opinion, we VACATE the sentences of both defendants and REMAND the cases to the district court for resentencing in accordance with this opinion and with Booker.