**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**November 22, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DAVID C. WITTIG,

Defendant - Appellant.

No. 06-3166

(D. Kansas)

(D.C. No. 02-CR-40140-JAR)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **McWILLIAMS**, and **McCONNELL**, Circuit Judges.

This is David C. Wittig's second appeal of his convictions on six charges arising out of a fraudulent bank transaction. On the first appeal we reversed his sentence because of errors in computing his offense level under the United States Sentencing Guidelines (USSG). *See United States v. Weidner and Wittig*, 437 F.3d 1023 (10th Cir. 2006) (*Wittig I*). We remanded for resentencing, noting that the intervening Supreme Court decision in *United States v. Booker*, 543 U.S. 220 (2005), had held that the Guidelines are not mandatory so that the district court

_____

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

should consider whether the sentencing factors set forth in 18 U.S.C. § 3553(a) would require a non-Guidelines sentence. *See Wittig*, 437 F.3d at 1047. The district court on remand imposed a higher sentence than before, and Mr. Wittig appeals. We reverse again because of errors in calculating the Guidelines offense level, errors that, in our view, were not harmless.

## I.   BACKGROUND

Mr. Wittig's offense occurred in 2001 when he was the chairman of the board, president, and chief executive officer of Westar Energy, Inc. (formerly Western Resources, Inc.), the largest electric utility company in Kansas. Mr. Wittig had substantial assets (a March 2001 financial statement reported a net worth of over $33 million) and had been a customer of Capital City Bank for several years. In 1998 he had borrowed $700,000 from the Bank to purchase a home, and two years later he had obtained a $1 million line of credit to renovate it. By 2001 his line of credit at the Bank had increased to $3.5 million.

Clinton Odell Weidner II was president, chief executive officer, and general counsel of the Bank. In early 2001 a bank customer inquired whether he knew anyone interested in investing in a real estate project in Arizona (the Project). The investment required $1.5 million. Mr. Weidner asked Mr. Wittig whether he was interested. Mr. Wittig declined, saying that he was focusing his investment efforts on Westar. Mr. Weidner then decided that he would pursue the Arizona opportunity himself. Because he did not have the required $1.5 million,

and because the Bank's policies forbade such a large loan to an employee, Mr. Weidner approached Mr. Wittig about a loan.

Shortly thereafter, Mr. Weidner prepared a proposal to increase Mr. Wittig's line of credit from $3.5 million to $5 million. On the proposal he stated that Mr. Wittig would use the increase to fund renovations on his home, purchase stock, and make business investments. After the Bank's owner approved the proposal, Mr. Wittig and his wife signed a "Change In Terms Agreement" which included a provision setting the annual interest rate at 5.39%. It also stated that the Wittigs' line of credit was being increased to $5 million, but Mr. Wittig crossed out the $5 million and wrote in $6 million. On April 30, 2001, he faxed the signed agreement to Mr. Weidner, $1.5 million was posted to his account, and the same amount was posted as a withdrawal and sent to an Arizona title company as Mr. Weidner's investment in the Project. The next day Mr. Weidner executed a promissory note to Mr. Wittig for $1.5 million at an annual interest rate of 7%. Both men failed to disclose this loan in various documents filed with the Bank. During the next year Mr. Weidner paid Mr. Wittig $97,000 on the loan.

After Bank officers discovered the improper loan in late 2001, a friend of Mr. Weidner's forwarded funds to Mr. Weidner's Arizona Project partner, who transferred the funds to Mr. Wittig's Bank account. Mr. Wittig then paid down his line of credit at the Bank by $1.6 million. When Mr. Weidner resigned from the Bank in April 2002, Mr. Wittig was asked to increase the collateral for his

-3-

line of credit by pledging additional Westar stock, increasing the mortgage on his home, and assigning life-insurance benefits. Mr. Wittig complied with the request. He paid off his line of credit three months later.

An indictment charged Mr. Wittig and Mr. Weidner with one count of conspiracy to submit false entries to a federally insured bank and to launder money (by investing the loan proceeds), *see* 18 U.S.C. § 371; four counts of making a false bank entry, *see* 18 U.S.C. § 1005; and one count of money laundering, *see* 18 U.S.C. § 1957. Mr. Wittig was found guilty on all six counts after a jury trial in the United States District Court for the District of Kansas.

At sentencing, the district court determined that under the 2002 version of the Sentencing Guidelines Mr. Wittig's base offense level was 6. The district court then enhanced his offense level under two Guidelines provisions. Section 2B1.1(b)(1) increases the offense level for large pecuniary losses associated with economic offenses. The loss can be actual or merely intended. *See id.* cmt. 2(A). The court found that Mr. Wittig and Mr. Weidner each intended a loss of $1.5 million to the Bank. It found that although there was no actual loss to the Bank, Mr. Wittig could have reasonably foreseen that the Bank would suffer pecuniary harm as a result of the loan transaction because Mr. Weidner did not have funds sufficient to repay the loan, and Mr. Wittig never intended to repay the loan himself. Accordingly, it increased Mr. Wittig's offense level by 16 levels to 22. *See id.* § 2B1.1(b)(1)(I).

The district court then applied the Guidelines gross-receipts enhancement, which increased Mr. Wittig's offense level to 24. *See id*. § 2B1.1(b)(12)(A). ("If the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense, increase by **2** levels . . . . If the resulting offense level . . . is less than level **24**, increase to level **24**.") (This provision was renumbered as § 2B1.1(b)(13)(A) in the 2005 version of the Guidelines.). The court also applied the gross-receipts enhancement to Mr. Weidner. The commentary to the Guidelines forbids counting the same gross receipts for more than one defendant:

> For purposes of subsection (b)(12)(A), the defendant shall be considered to have derived more than $1,000,000 in gross receipts if the gross receipts to the defendant individually, rather than to all participants, exceeds $1,000,000.

USSG § 2B1.1 cmt. n.9(A) (renumbered as cmt. n.11(A) in the 2005 version). But the district court justified application of the enhancement to both Mr. Weidner and Mr. Wittig essentially on the ground that Mr. Wittig had received $1.5 million from the Bank, whereas Mr. Weidner had received $1.5 million from Mr. Wittig.

Because Mr. Wittig had a criminal-history category of I, his Guidelines sentencing range was 51 to 63 months. The district court sentenced him to six concurrent terms of 51 months' imprisonment followed by three years of supervised release. It also ordered him to pay a $1 million fine.

On Mr. Wittig's appeal we held that the district court had erred in its application of both the intended-loss and gross-receipts enhancements. *See Wittig*, 437 F.3d at 1047-48. With respect to intended loss, we said that "the district court did not adequately consider the amount of collateral provided by Mr. Wittig in determining the amount of loss under an intended loss theory." *Id.* at 1048. Before the district court could ignore the collateral pledged (the additional utility stock, life insurance benefits, and mortgage on his residence) when determining intended loss, it first had to "determine that the defendant intended to deprive the lender of its collateral." *Id.* Because the district court made no such finding, it "erred in calculating the amount of loss under the intended loss approach." *Id.*

As for the gross-receipts enhancement, we held that the district court "erred in attributing the $1.5 million in gross receipts to both Mr. Wittig and Mr. Weidner." *Id.* at 1046. We affirmed the enhancement as to Mr. Weidner, but reversed as to Mr. Wittig. *See id.* at 1047. We noted, however, that after *Booker* the Guidelines were no longer mandatory and the district court could appropriately consider a range of factors, including the "nature and circumstances of the offense," when determining an appropriate sentence. *Id.*; *see* 18 U.S.C. § 3553(a). In this case, we added, those circumstances included "that Mr. Wittig and Mr. Weidner each used the $1.5 million from the line of credit increase in

different ways and derived some benefit from it." *Wittig*, 437 F.3d at 1047. We vacated the sentence and remanded for resentencing. *See id.* at 1050.

Before the resentencing hearing, the sentencing judge presided over a trial of Mr. Wittig on charges of engaging in a wide-ranging fraudulent scheme and conspiracy during his tenure at Westar. *See United States v. Wittig,* 425 F. Supp. 2d 1196, 1204 (D.Kan. 2000). We will refer to the trial as the Westar Case. Mr. Wittig was found guilty on 39 counts of conspiracy, circumvention of internal controls, wire fraud, and money laundering, and was sentenced to 18 years' imprisonment. In addition, he was required to forfeit some of the items he had pledged as collateral for the $1.5 million loan from the Bank. *See United States v. Wittig*, No. 5:03-CR-40142JAR, 2006 WL 897599, *3 (D. Kan. April 3, 2006).

Also before the resentencing hearing, the district court released Mr. Wittig on bond pending his initial appeal. On January 19, 2006, the court revoked the bond upon finding that he had violated his conditions of release by engaging in unreported and unauthorized financial transactions.

The Presentence Investigation Report (PSR) prepared for the resentencing hearing calculated Mr. Wittig's offense level as the district court had at the initial sentencing: his base offense level was 6, an intended loss of $1.5 million justified a 16-level enhancement, and gross receipts of $1.5 million resulted in a total offense level of 24. At the hearing on June 24, 2006, the district court again used the gross-receipts enhancement to calculate Mr. Wittig's offense level. It

expressed its understanding of our holding as saying that it had been error to apply the $1.5 million in gross receipts to both defendants because "the district court [had] not articulate[d] separate and independent and individual use of the gross receipts." Aplt. App. Vol. I at 128. To avoid repeating this perceived error, the district court enumerated the various ways that Mr. Wittig and Mr. Weidner each benefitted from the $1.5 million loan. It stated that Mr. Wittig benefitted from an increased line of credit, interest payments from Mr. Weidner, and the expectation of a quid-pro-quo from Mr. Weidner and the Bank to provide financing for him to participate in an expected securities offering related to Westar. The court found that "Wittig and Weidner individually and separately and successively received the monies and used them in different manners and for different purposes. . . . This does establish separate and individual receipt and separate and individual use of the monies . . . ." *Id*. at 164. It further made a specific finding that Mr. "Wittig did in fact derive the $1.5 million, as is required by application of the gross receipts analysis guideline." *Id*. at 154-55.

As for intended loss, the district court acknowledged that "collateral pledged should be given credit," *id*. at 156, but added that much of the collateral was subject to forfeiture because it was obtained by fraud, so the line of credit was not "secured in a very secure fashion," *id*. It also reasoned that "the borrower's ability to pay is not an appropriate credit against intended loss

[because] [i]f it were, it would be appropriate to call this credit the rich man's credit." *Id*.

Further considering evidence from the Westar Case, the district court said "that this particular [bank-fraud] transaction was part of a larger scheme in which this defendant intended to cause loss to Westar Energy of more than $1 billion. . . . The Court necessarily takes those facts and circumstances into account in fashioning a sentence under Section 3553(a)." *Id*. at 157-58.

When the district court pronounced sentence, it stated that it was "in essence applying both the gross receipts guideline and the intended loss guideline." *Id*. at 166. But, it added, "even if the gross receipts guideline did not apply or the intended loss would not apply, the underlying nature and circumstances that [the court has] outlined in great detail here would still counsel this Court under 3553 to apply the sentence that [the court is] about ready to announce." *Id*. Without detailing how it determined Mr. Wittig's offense level, it stated that his total offense level was 24, the criminal-history level was I, and the Guidelines sentencing range was 51 to 63 months. It then "tentative[ly]" imposed concurrent sentences of 60 months' imprisonment on each count, and a $1 million fine. *Id*. at 166-68.

Next the district court stated that the tentative sentence was a reasonable sentence in light of the § 3553(a) factors. The court began by emphasizing its reliance on the Guidelines:

In reaching this determination the Court has considered: One, that the sentencing range developed from the application of the advisory guidelines incorporates a number of directives from Congress to the Sentencing Commission concerning the sentencing of offenders, including the purposes of sentencing set forth at 18 U.S.C. Section 3553(a)(2). Therefore, a sentence imposed within the range determined by the guidelines may be given substantial weight in the determination of a just and reasonable sentence, in accordance with the provisions of 18 U.S.C. Section 3553(a)(2)(A) through (C).

*Id.* at 169. It then noted Mr. Wittig's failure to accept responsibility, evidence that he had engaged in new criminal behavior while on appeal bond, the lack of mitigating factors, and the seriousness of his offense. It expressed its belief that the sentence imposed promoted respect for the law and provided just punishment, and that Mr. Wittig's conduct justified a sentence of the same length as his codefendant. Finally, the court stated that the sentence would protect the public, deter further criminal behavior, and allow Mr. Wittig to receive correctional treatment. The court did not, however, explain why the sentence imposed was justified even if the Guidelines range was only 0 to 6 months.

The district court's written sentence and Statement of Reasons was filed several days later. It stated that the court was adopting the PSR, except that it found that there was no intended loss under the Guidelines (despite the court's discussion of intended loss at the sentencing hearing). The court made no entry in Section VI of the Statement of Reasons, entitled "Court Determination for Sentence Outside the Advisory Guideline System." *Id.* at 209.

## II. DISCUSSION

In *Booker*, 543 U.S. at 231-32, 259, the Supreme Court held that mandatory application of the Guidelines violated the Sixth Amendment, excised that portion of the statute that made them mandatory, and effectively rendered the Guidelines advisory. When reviewing a sentence post-*Booker*, we review for reasonableness, applying a two-step analysis. *See United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). "First, we must determine whether the district court considered the applicable Guidelines range, reviewing its legal conclusions de novo and its factual findings for clear error. A non-harmless error in this calculation entitles the defendant to a remand for resentencing." *Id.* "[I]f we conclude that the district court correctly applied the Guidelines or that any errors were harmless," we proceed to the second step—considering whether the ultimate sentence imposed was reasonable. *United States v. Hernandez-Castillo*, 449 F.3d 1127, 1129-30 (10th Cir. 2006).

### A. Application of Guidelines

We hold that the district court again erred in computing Mr. Wittig's offense level under the Guidelines. The base offense level for Mr. Wittig's crime was 6. The only potential grounds for increasing it would be the gross-receipts enhancement, *see* USSG § 2B1.1(b)(12)(A), or the intended-loss enhancement, *see id.* § 2B1.1(b)(1)(I). Neither ground applies.

Mr. Wittig argues that the district court disregarded our holding in *Wittig I* and impermissibly reapplied a gross-receipts enhancement to determine his offense level. We agree. Our prior opinion was categorical—"the district court erred in attributing the $1.5 million in gross receipts to both Mr. Wittig and Mr. Weidner." *Wittig*, 437 F.3d at 1046. The district court read our opinion to say that it was error to apply the $1.5 million in gross receipts to both defendants because "the district court did not articulate separate and independent and individual use of the gross receipts." Aplt. App. Vol. I at 128. We do not share that reading. At most our opinion noted that the cases relied on by Mr. Wittig could be distinguished from his case because "none . . . involved a series of offenses in which each defendant successively used the receipts in a separate fashion . . . ." *Wittig,* 437 F.3d at 1046. But to say that cases can be distinguished means only that they do not *control* the present case; it is not to say that their conclusions should be rejected. On the contrary, after noting the distinguishing factors in Mr. Wittig's case, we still proceeded to hold that Mr. Wittig was correct in challenging the applicability to his case of the gross-receipts guideline. *See id.* The only use we permitted the district court to make of the "gross-receipts" facts on remand was to consider them under § 3553(a) to impose a non-Guidelines sentence. *See id.* at 1047.

The parties dispute whether the district court also applied an intended-loss enhancement in computing Mr. Wittig's Guidelines offense level. The

-12-

government argues that the district court correctly determined the offense level by applying an intended-loss enhancement. Mr. Wittig, in contrast, argues that the court's Statement of Reasons specifically found no intended loss under the Guidelines. The government urges us to apply the rule that when the oral sentence pronounced at sentencing is inconsistent with the later written sentence, the oral sentence controls. *See United States v. Villano*, 816 F.2d 1448, 1450 (10th Cir. 1987) (en banc) (plurality opinion). But that rule applies only to the sentence—that is, "the punishment imposed," *id.* at 1453—not the explanation for the sentence.

In any event, the evidence before the district court would not support an intended-loss enhancement. In *Wittig I* we noted that Mr. Wittig's loan was collateralized and that to "ignore collateral in determining intended loss, the court must first determine that the defendant intended to deprive the lender of its collateral." *Wittig*, 437 F.3d at 1048; *see United States v. Schild*, 269 F.3d 1198, 1201 (10th Cir. 2001) (borrower intended to deprive bank of collateral). The district court on remand made no finding of such an intent, there was no evidence that would support such a finding, and, indeed, we have been pointed to no evidence that Mr. Wittig intended the Bank to lose any money on its loan to him.

Thus, it was error for the district court to increase Mr. Wittig's offense level above the base offense level of 6. Given his criminal history category of I,

his Guidelines sentencing range was 0 to 6 months, well below his actual sentence of 60 months. We now address whether this error was harmless.

**B.    Harmless Error**

The government argues that the sentence should be affirmed even if the district court miscalculated Mr. Wittig's offense level because other factors make the sentence reasonable and the court said that it would impose the same sentence even if the gross-receipts and intended-loss enhancements did not apply. We are not persuaded.

To begin with, the reasonableness of the imposed sentence is irrelevant to the harmless-error analysis. A defendant is harmed by a reasonable sentence if the court, absent the error, would have imposed a lesser, but still reasonable, sentence. The government does not argue that Mr. Wittig received the lowest possible reasonable sentence.

The alternative sentence requires somewhat more discussion. We recognize that we have relied on a district court's expression of an alternative sentence in determining that *Booker* error was harmless. *See, e.g., United States v. Serrano-Dominguez*, 406 F.3d 1221, 1224 (10th Cir. 2005). But those cases are readily distinguishable. In those cases the district court had correctly calculated the Guidelines sentencing range. The question was only whether the district court, if it had known that it had discretion to vary from the Guidelines range, would have exercised that discretion. A statement by the district court that it would not do so

-14-

was an answer to that question. *See id.* (court stated that in fashioning alternative sentence under § 3553(a) the court would apply "precisely the same sentence as the guidelines require" (internal quotation marks omitted)).

Here, however, the government asks us to assume that even if the district court had known that the sentence imposed was a dramatic variance from the highest possible Guidelines sentence, it would not have been influenced by that knowledge. We lack the government's confidence in that assumption. After all, in addressing the § 3553(a) factors the district court began by noting the substantial weight to be given to the Guidelines in arriving at a sentence. We cannot presume that the court would not have been influenced by knowing that the sentence being imposed was 10 times as long as the maximum under the Guidelines range. Moreover, although the court gave reasons why it believed the imposed sentence was reasonable, it failed to explain what "dramatic facts" justified "such an extreme divergence from the best estimate of Congress's conception of reasonableness expressed in the Guidelines." *United States v. Cage*, 451 F.3d 585, 594 (10th Cir. 2006). Unmarked in the Statement of Reasons was the section in which the court must explain why it imposed a non-Guidelines sentence. The court would need to explain what the Guidelines failed to take into account and why that omitted factor is of such enormous consequence. *See United States v. Bishop*, No. 05-3173, 2006 WL 3237027, at *10 (10th Cir. Nov. 9, 2006) (justification must be proportional to the variance).

In addition, we doubt the relevance of some of the considerations apparently relied on by the district court in imposing sentence. As previously noted, there is no evidence to support a finding that Mr. Wittig intended a loss to the Bank; and the relationship of his loan to any loss intended to be inflicted on anyone else (in the Westar Case) is simply too tenuous to justify a variance from a Guidelines sentence. Indeed, if the district court is to use Mr. Wittig's conviction in the Westar Case to increase his sentence in this case beyond what would be appropriate as a result of considering his Westar conviction as part of his criminal history, the court will need to point to specific evidence justifying the increase. In other words, we understand why Mr. Wittig's sentence should reflect the criminal history established by his convictions in the Westar case; but we fail to understand why those convictions are otherwise relevant to his present sentence. The district court said that there was evidence that Mr. Wittig's accommodation to Mr. Weidner was part of a quid-pro-quo arrangement in which the Bank would later loan Mr. Wittig and others the sums necessary to exercise rights to purchase Westar stock, a central component of the scheme charged in the Westar case. The government, however, has failed to point us to that evidence, and we note the apparent inconsistency between the claim that Mr. Weidner needed such a quid-pro-quo inducement and the claim that exercise of the purchase rights was extremely advantageous to Mr. Wittig (thereby suggesting the attractiveness to the Bank of financing the purchases).

**III.    CONCLUSION**

We VACATE Mr. Wittig's sentence and REMAND for resentencing in accordance with this opinion.  Mr. Wittig's motion to enforce the mandate is DENIED.

ENTERED FOR THE COURT


Harris L Hartz
Circuit Judge